IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| ISAAC J. FOLSOM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:10-CV-04128-NKL |
| | ) |
| MORGAN COUNTY, MISSOURI, | ) |
| MORGAN COUNTY SHERIFF JIM | ) |
| PETTY and DETECTIVE RON WITT, | ) |
| in their individual and official capacities, | ) |
| HEATHER SPERRY, and MELODEE REY | ) |
| | ) |
| Defendants. | ) |

**ORDER**

Before the Court is the Motion for Summary Judgment [Doc. # 41] filed by Defendants Morgan County, Missouri, Morgan County Sheriff Petty, and Morgan County Detective Ron Witt (collectively, "the Morgan County Defendants"). For the following reasons, the Court grants the motion.

**I.   Background**

    **A.   Uncontroverted Facts**[1]

---

[1] The Court has considered the parties' statements of undisputed fact which are supported by evidence. In considering this motion, the Court has drawn all inferences in favor of the non-movant.

Plaintiff Isaac J. Folsom did not rape Defendant Heather Sperry, nor did he ever have sexual intercourse with her. However, she alleged that he did and that resulted in Folsom being investigated by law enforcement.

Defendant Witt began investigating Plaintiff Folsom on January 10, 2007, when another deputy, Thomas Wright, contacted him about a female reporting that she had been raped. Witt met with Deputy Wright, Defendant Sperry, and her step-mother, Defendant Melodee Rey. Witt states that at that meeting Sperry claimed that Isaac Folsom had raped her on December 31, 2005, in a black 4x4 Ford extended-cab pickup truck in a field off of Highway FF, between Blackberry Lane and Highway 52. At that time, Sperry would have been 16 years of age. Defendant Witt terminated the interview upon hearing the report and set up an appointment for a forensic interview with an organization called Child Safe of Central Missouri, Inc.

The next day, January 11, 2007, Witt met Sperry and Rey in Sedalia at the Child Safe office, where he watched the interviewer, Beth Jackman, question Sperry behind closed doors. A disc recording of the interview was made. The report from Child Safe's Ms. Jackman about the interview is dated January 23, 2007. According to Ms. Jackman's report, Sperry's statement was that Plaintiff Folsom had genital intercourse with her on December 31, 2005. [Doc. # 42, Ex. 1 at 16.] Ms. Jackman did not come to any conclusion about the truth of Sperry's statements. Witt has regularly used Child Safe to conduct forensic interviews of young people alleged to be victims of abuse, and has found them to provide good interviewers.

Plaintiff Folsom became aware on January 16, 2007, that Sperry was accusing him of raping her on December 31, 2005. He was informed of the allegations by Jeff Riley when he went to the gas station where Riley worked. Folsom immediately went to the store where Sperry worked to confront her about the false allegations she had made, but she refused to speak to him. Folsom then phoned Heather's father, Frank Sperry, who told Folsom that he had heard nothing about such allegations. Frank Sperry agreed to go to town to talk to Heather and then call Folsom back within an hour.

A short time after Folsom called Frank Sperry, he received a call from Heather Sperry. Unbeknownst to him, the call was recorded by Defendant Witt. Witt had met Sperry and Rey at the store where Sperry worked with a tape recorder. During the call, Folsom denied that he had raped Sperry. The recorded call was not provided to the prosecuting attorney, and it was not mentioned in Witt's probable cause statement.

On the afternoon of January 16, 2007, Plaintiff Folsom also received a call from Defendant Witt, who told him to stop harassing witnesses. Folsom asked Witt what he was talking about and what witnesses he was allegedly harassing. Witt did not inform Folsom that he was the subject of any investigation, nor did he give a *Miranda* warning to Folsom during the call.

That evening, Plaintiff Folsom received a second call from Defendant Witt, asking him to come to the Justice Center. Folsom agreed that he would do so the following morning and inquired whether he would need an attorney. Defendant Witt replied that he was not Plaintiff Folsom's attorney and that he should ask his "fucking brother Matt."

Isaac Folsom's brother, Matt Folsom, had been convicted of a sex offense in South Dakota. At the time of the incidents involved in this suit, Matt Folsom was registered as a sex offender in Morgan County, Missouri. Defendant Witt knew that Matt Folsom was a convicted sex offender. Witt's father is also a convicted sex offender.

After Defendant Witt's second call, Plaintiff Folsom called his attorney, Kenneth Hayden, who agreed to meet with him the following morning. On the morning of January 17, 2007, Folsom met with Hayden, who advised him not to meet with Defendant Witt and that if he did meet with Witt he should not make a statement.

Plaintiff Folsom went to Defendant Witt's office pursuant to Witt's request at 9:00 a.m. on January 17. He informed Witt that on the advice of counsel he would not make a statement, whereupon he was taken into custody. Witt then prepared a probable cause statement and provided it to the Morgan County Prosecutor, setting out the basis for his belief that Folsom had raped Sperry. [Doc. # 42, Ex. 1 at 17-19.] Charges were filed against Plaintiff Folsom for forcible rape and statutory rape on January 17, 2007.

At that time, the evidence that Witt had in his possession consisted of the various statements of Heather Sperry and the VHS tape recording of the forensic interview, as well as the recording of the telephone conversation between Sperry and Folsom.

Sperry's January 11, 2007 recorded statement to Child Safe alleged the following. On Highway 52, west of Stover, Plaintiff Folsom began to touch her legs and chest. He put his hand down her shirt. She pushed his hand out and told him to stop. Folsom asked her if she wanted to have sex and she told him "no." Plaintiff put his hand in her shirt and

4

fondled her breast. Folsom pulled into a field off of Highway FF. It was an open pasture with bales of hay. He told her to sit there, then got out and went around to the other side of the truck and put her in the back seat. He then took off her pants. She did not remember what he was wearing. She told Folsom "no" several times. She tried to fight him off. She said he needed to think about his wife and kids. Folsom held her arms down just above her elbows. When his penis was inside of her, Folsom moved back and forth and up and down. When Folsom finished, she pulled up her pants and he pulled up his pants. He asked her if it felt good. She spent the night at Folsom's house and her mother picked her up the next morning.

On January 11, 2007, Defendant Sperry's boyfriend, Michael McNeal, alleged that she had told him the following on January 5, 2007. Plaintiff Folsom pulled off onto Highway FF. He pulled into a field of someone he did not know. After the vehicle was stopped, he told her "I want to fuck you." He started touching her breasts and legs, moving toward her vagina. He unbuttoned her pants. She pushed his hands away. She said, "We can't do this." He then forced her into the back seat of the pickup truck. He pulled her clothes off. He then inserted his penis into her vagina. She repeatedly said "we can't do this." It lasted an estimated two minutes, when she said "we can't do this" and successfully struggled to get him off of her. They got back in the front seat and drove to his house so that she could babysit.

On January 12, 2007, Defendant Rey alleged that Defendant Sperry had told her the following. Plaintiff Folsom picked her up. On Blackberry Patch, he pulled off the road into

5

a field off of Highway FF. She got him to stop by telling him to think about his kids, and he just quit. She burned her underwear. This was her first sexual experience.

During her January 16, 2007 phone conversation with Plaintiff Folsom, Sperry alleged that she and Plaintiff "made love" and that Plaintiff did not rape her.

Defendant Witt did not investigate the inconsistencies in Sperry's statements.

When the charges were filed against Folsom on January 17, 2007, Witt had not examined the history of title to the black Ford extended-cab pickup truck identified by Sperry. Witt states that he had not investigated the ownership of the vehicle because he had known Folsom to have a truck matching this general description for some time and had seen him driving it before around the community. Folsom bought the black Ford extended-cab pickup in February, 2006. Before February 2006, it belonged to Folsom's brother, Isom Folsom, who also resides in the Stover area.

Witt did not conduct an inspection of the truck, nor did he ever locate the field off of Highway FF alleged to have been the scene of the crime. Sperry had alleged that the rape occurred more than a year before she came forth with her accusations.

Sperry babysat for Isaac and Lisa Folsom on several occasions, both before and after December 31, 2005. Defendant Witt did not question any potential witness regarding Sperry's babysitting for the Folsoms in the past.

Defendant Rey, rather than Plaintiff Folsom, drove Sperry to Plaintiff's residence to babysit on December 31, 2005, as she had done in the past. Defendant Witt did not question

6

any potential witness regarding who typically drove Sperry to the Folsom's to babysit or investigate whether Plaintiff had driven her to babysit.

On January 5, 2007, Sperry first stated that Folsom had raped her to her boyfriend, Michael McNeal, when she told him that the only person she had had sex with prior to him was Folsom. According to Rey, Sperry had informed her that (other than Folsom) she had only had sex with her prior boyfriend, Alex Chapman, in May 2006. Defendant Witt did not question any potential witness regarding Sperry's prior sexual activity or the reason for her delay of over a year in reporting the alleged rape.

Sperry and McNeal wrote many letters to each other in the month leading up to January 17, 2007, when Folsom was arrested, including statements regarding Folsom. Defendant Witt did not question Sperry or McNeal about documentary evidence. The letters were not brought to light until a highway patrol investigation after the dismissal of charges against Folsom.

When Sperry informed McNeal of her allegations against Folsom on January 5, 2007, McNeal gave her three options, stating that he would break up with her if she did not choose one of them: (1) tell the police; (2) tell her parents; or (3) confront Folsom. At that time, Sperry did not wish to report that Folsom raped her. Two days later, McNeal informed Sperry that she could either tell her parents and keep him as a boyfriend or not tell her parents and he would break up with her. Defendant Witt did not question any potential witness regarding whether Sperry's boyfriend's threats to break up with her encouraged her to make a false statement against Folsom.

7

In June 2007, on the day before her 18th birthday, Sperry officially recanted her earlier statements and denied that Folsom had raped her in a written statement turned in to the Morgan County Sheriff's Department. On July 11, 2007, Sperry provided a second written denial of the allegations that she had made against Folsom. Following a hearing, the charges against Folsom were dropped.

After recanting, Defendant Sperry stated that her step-mother, Defendant Rey, coerced her to make false allegations against Plaintiff Folsom. Defendant Witt had not interviewed Sperry's father regarding his daughter's allegations against Folsom.

Defendants have produced the following certificates of completion bearing Detective Witt's name as well as dates between 1989 and 2007: (a) Video taping child sexual abuse victims; (b) Criminal co-investigating of child abuse; (c) Crime scene investigation in child physical abuse and homicide investigations; (d) Interviewing the child victim; (e) Advanced crime scene investigation; (f) Ethical decision making and crime scene investigation; (g) Interviewing the child victim and video taping interviews; (h) The interrogation process; (i) Interviewing and interrogation, in 2001; (j) Interviewing skills; (k) Juvenile interrogation and interviews; (l) Understanding and interviewing sex offenders; (m) Probable cause and reasonable suspicion. [Doc. # 42, Ex. 2 at 20-31.]

Defendant Witt was the Morgan County Sheriff's Department detective in charge of the Folsom investigation up to the point when Sperry decided to recant her statement implicating Folsom. Plaintiff Folsom has no information indicating that anyone at the Sheriff's Department prompted Defendants Sperry and Rey to accuse Folsom of rape.

8

Folsom cites the words of the late Gary W. Young, then editor of the *WestSide Star*, which were printed in the October 10, 2007 edition of that newspaper: "Morgan County Sheriff Jim Petty did say that Matt Folsom's arrest and conviction in an Internet sex case in South Dakota had some bearing on his brother Ike's case." [Doc. # 52, Ex. 1.]

At the time of the occurrence giving rise to Plaintiff's claims, liability coverage issued by the Missouri Public Entity Risk Management Fund (MOPERM) was in effect.

**B.     Procedural History**

Plaintiff Folsom filed his Complaint on June 14, 2010, asserting a total of ten counts against the movants here – i.e., the Morgan County Defendants – as well as Defendants Sperry and Rey.

Plaintiff's Complaint lays out the following federal law claims. Count I asserts a claim under 42 U.S.C. § 1983 for "Failure to Use Adequate Procedures[:] Reckless Indifference And/Or Gross Negligence," naming the Morgan County Defendants. [Doc. # 1 at 6.] Count II asserts a claim for failure to train under section 1983 against Defendants Petty and Morgan County. Count III asserts a negligent assignment claim under section 1983 against Defendants Petty and Morgan County. Count IV asserts a negligent supervision claim under section 1983 against Defendants Petty and Morgan County.

Plaintiff's Complaint also lays out the following state law claims. Count V asserts a claim for negligence per se against "All Defendants." However, Plaintiff subsequently indicated that Count V was asserted only against the Morgan County Defendants. [Doc. # 24.] Count VI asserts a claim for negligence against Defendant Petty. Count VII asserts a

9

claim for negligence against Defendant Witt. Count VIII asserts a malicious prosecution claim against Defendant Sperry. Count IX asserts a malicious prosecution claim against Defendant Rey. Count X asserts a malicious prosecution claim against Defendant Witt.

On October 18, 2010, the Court entered a default against Defendant Sperry and ordered an evidentiary hearing to be held on November 4, 2010, prior to entering a judgment. [Doc. # 23.] After the presentation of evidence at the November 4 hearing, the Court found Defendant Sperry liable for her actions and entered a default judgment against her in the amount of $500,000 for economic and non-economic damages and $2,000,000 for punitive damages. [Doc. # 24.]

On October 4, 2010, the Court denied Defendant Rey's motion to dismiss. [Doc. # 22.] On May 23, 2011, the Court also denied Defendant Rey's motion for a continuance and to revise the Scheduling Order. [Doc. # 57.] Defendant Rey does not join the Morgan County Defendants in submitting a motion for summary judgment.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

**B.     Plaintiff's Federal Law Claims under Section 1983**

**1.     Count I**

Plaintiff Folsom's Count I asserts a claim under 42 U.S.C. § 1983 for "Failure to Use Adequate Procedures[:] Reckless Indifference And/Or Gross Negligence," naming the Morgan County Defendants. [Doc. # 1 at 6.]  Plaintiff now clarifies:

> A claim for reckless investigation is a cognizable claim. *Amrine v. Brooks*, 522 F.3d 823 at 833 *citing Wilson v. Lawrence County, Mo.*, 260 F.3d 946 (8th Cir. 2001). In *Wilson* the liberty interest stake was identified as the "interest in obtaining fair criminal proceedings." *Id.* at 956 n. 8. . . .

[Doc. # 53 at 26.]   Indeed, the Eighth Circuit's *Wilson* opinion is instructive:

> Negligent failure to investigate other leads or suspects does not violate due process.. . . .   The general test of whether executive action denying a liberty interest is egregious enough to violate due process is whether it shocks the conscience.  The Supreme Court has taken a context specific approach to determining whether intermediate culpable states of mind, such as recklessness, support a section 1983 claim by shocking the conscience and, thus, violating due process.

11

260 F.3d at 955-56 (citations omitted).

Subsequently, the Eighth Circuit has explained that to establish a violation of due process based on a failure to investigate, a plaintiff must show that the officers "intentionally or recklessly failed to investigate, thereby shocking the conscience." *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009) (quoting *Amrine v. Brooks*, 522 F.3d 823, 834 (8th Cir. 2008)). A review of Eighth Circuit cases has indicated that the following circumstances suggest reckless or intentional failure to investigate which shocks the conscience: "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Id.* (citing *Amrine*, 522 F.3d at 833-35).

Plaintiff Folsom relies heavily on *Wilson*, which affirmed the denial of the defendant police officers' motion for summary judgment. However, the facts in *Wilson* were distinguishable from these facts considered in the light most favorable to Folsom:

> In the days following the murder, officers interviewed Wilson twice. During these initial interviews Wilson consistently stated that he knew nothing about the crime and had been shopping with his mother prior to the fatal fire. Through their investigation, the appellants discovered that Wilson was twenty years old, still lived at home, worked occasional odd-jobs, was mentally impaired, had attended mostly, if not exclusively, special education classes in high school and that some people believed he could be "talked into anything."
> . . .
> The record does not mention any independent physical or circumstantial evidence linking Wilson to the crime, or corroborating his confession.
> . . .
> Wilson points to information concerning an escaped felon with a *modus operandi* matching this homicide and an eyewitness who saw someone outside

12

of the house shortly before the fire (and who would have testified that the person she saw was not Wilson) as the leads the officers chose not to pursue. The district court held that, absent the evidence of coercion of Wilson's confession and [evidence of threats to put another mentally-impaired youth in jail if he did not implicate Wilson], failure to investigate these additional leads would not support a claim of recklessness or deliberate intent and thus would not comprise a constitutional violation. However, the court reasoned "[i]f Wilson's allegations about unlawful coercion are proved true, a reasonable factfinder could determine that Defendants recklessly or intentionally chose to force Wilson to confess instead of attempting to solve the murder through reliable but time consuming investigatory techniques designed to confirm their suspicions." We agree.

260 F.3d at 949, 950, 955 (citation omitted).

Thus, in *Wilson* the plaintiff had a strong case of a reckless investigation violating the Due Process Clause, having submitted evidence of: (1) state actors attempting to coerce him, (2) investigators purposefully ignoring evidence suggesting his innocence, and (3) systematic pressure to implicate him in the face of contrary evidence. Here, in contrast, Plaintiff Folsom has not submitted evidence of any such conscience-shocking conduct.

First, in *Wilson*, there was strong evidence that investigators lured the mentally-impaired plaintiff into a windowless interrogation room where they spent hours coercing him, using a variety of psychological tricks to transform "a collection of discombobulated facts about the murder" into a confession. *Id.* at 950. Here, Defendant Witt's reference to Plaintiff's "fucking brother Matt" – though aggressive and inappropriate – does not rise to the level of a threat or coercion that shocks the conscience. It is uncontroverted that when Folsom went to Defendant Witt's office at the Justice Center, he informed Witt that on the

advice of counsel he would not make a statement, whereupon he was taken directly into custody.

Second, in *Wilson* there was evidence that the officers purposefully ignored both (1) information concerning an escaped felon with a *modus operandi* matching the homicide, and (2) an eyewitness who saw someone outside of the house shortly before the fire and who would have testified that the person she saw was not Wilson. The Eighth Circuit agreed with the district court that absent the extensive evidence of coercion, "failure to investigate these additional leads would not support a claim of recklessness or deliberate intent and thus would not comprise a constitutional violation." *Id.* at 955. However, if Wilson's allegations about unlawful coercion were proved true, a reasonable factfinder could determine that the officers recklessly or intentionally chose to force Wilson to confess instead of attempting to solve the murder by following the additional leads. *Id.* Here, in contrast, not only is there insufficient evidence of any unlawful coercion, but there is also less compelling evidence of leads ignored. There was no eyewitness who would exculpate Folsom, nor were there any other suspects in this case. Since Folsom invoked his right to remain silent, the Morgan County Defendants were not informed that Folsom did not own the pickup truck in question at the time of the alleged rape. (Rather, it was owned by Folsom's brother.) As in *Akins*, where the officer "did not know about the [exculpatory evidence] until the trial, so he could not have purposefully ignored that evidence," Plaintiff Folsom also "has not established . . . more than mere negligence, which is insufficient to establish a claim of conscience-shocking conduct." 588 F.3d at 1184. After all, unlike in *Wilson* where there was no independent

14

evidence linking the plaintiff to the murder, here Sperry came to the Morgan County Defendants accusing Plaintiff Folsom of an essentially "he-said she-said" crime that had allegedly occurred more than a year before.

Finally, in *Wilson* there was evidence of systematic pressure to implicate the mentally-impaired plaintiff in the face of the contrary evidence mentioned above. In addition to the coercive techniques used to force Wilson's confession, there was further evidence that the officers coerced a second individual:

> Officers knew that Wall was a junior in high school, involved in special education classes, and was slightly mentally impaired. They also knew that he had disciplinary problems at his school and had been described as a "very skilled liar" by school officials. As a result of several custodial interrogations in the days following the murder, Wall told the officers on April 18 that Wilson had confessed to Wall that he committed the crime. That same day, Wall passed a polygraph examination regarding this issue. Wilson challenges the efficacy of the polygraph test, based not only on the fact that Wall's statement proved to be false, but also on the insufficient amount of time allowed for the numerous polygraph tests Wall was given on April 18, and the difficulty the examiner had in interpreting the tests.

*Wilson*, 260 F.3d at 949. This is an example of systematic pressure to implicate an innocent man in the face of contrary evidence that shocks the conscience. Here, in contrast, it was Sperry who came to the Morgan County Defendants accusing Folsom of rape. There is no evidence that the Morgan County Defendants pressured Sperry or anyone else to implicate Folsom. Instead, as Plaintiff suggests, the evidence indicates that Sperry's step-mother and boyfriend may have exerted pressure on her to come forward with her accusations.

For these reasons, Plaintiff Folsom has not submitted evidence of any conscience-shocking conduct on the part of the Morgan County Defendants. Therefore, it is unnecessary

for the Court to address the qualified immunity argument put forth by Defendants Witt and Petty.

## 2. Supervisory Liability

Plaintiff Folsom's Count II asserts a claim for failure to train under section 1983 against Defendants Petty and Morgan County. Count III asserts a negligent assignment claim under section 1983 against Petty and Morgan County. Count IV asserts a negligent supervision claim under section 1983 against Petty and Morgan County.

The Supreme Court wrote in *Monell v. Department of Social Services of the City of New York*:

> Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

436 U.S. 658, 690-91 (1978). The Eighth Circuit has explained that a local governing body "may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (citing *Monell*, 436 U.S. at 694). Thus, to establish liability, a plaintiff must prove that the local government's "custom or policy was the moving force behind the constitutional violation." *Reasonover v. St. Louis County, Mo.*, 447 F.3d

569, 583 (8th Cir. 2006). "Before a municipality can be held liable . . . there must be an unconstitutional act by a municipal employee." *Id.* (quoting *Russell v. Hennepin County*, 420 F.3d 841, 846 (8th Cir. 2005)). In *Reasonover v. St. Louis County*, the Eighth Circuit noted:

> Because we hold [plaintiff] fails to show any unconstitutional acts by Board employees, we need not reach the issue whether the Board had an unconstitutional policy or custom, nor need we discuss [plaintiff's] expert's testimony claiming the [Major Case Squad] lacked adequate policies on training and supervising employees as to the collection and disclosure of evidence.

*Id.* at 583 n.4.

Here, because the Court holds that Plaintiff Folsom fails to show any unconstitutional deprivation by the Morgan County Defendants under his core reckless investigation theory, the Court need not reach the issue of whether the Morgan County Defendants had an unconstitutional policy or custom or lacked adequate policies on training and supervising employees. Regardless, Plaintiff Folsom has identified no official policy which could have been the moving force behind the alleged constitutional violation, nor has he shown any deliberate indifference. *See Mettler*, 165 F.3d at 1204. As Plaintiff concedes, "section 1983 liability by officers does not result from 'negligent behavior.'" [Doc. # 53 at 39 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 854-55 (1998)).] Even if Plaintiff could point to a constitutional deprivation to support his negligent supervision theory, Plaintiff has failed to submit sufficient evidence of anything more than negligence on the part of the Morgan County Defendants.

For the reasons stated above, the Court grants the Morgan County Defendants' Motion for Summary Judgment with respect to Plaintiff's federal law claims.

### C. Plaintiff's State Law Claims

With respect to Plaintiff's state law claims, Defendants argue that Morgan County has sovereign immunity and Defendants Witt and Petty have official immunity. Plaintiff has presented no counterargument to Defendants' grounds for summary judgment regarding the state law claims.

#### 1. Sovereign Immunity

In Missouri, a public entity is afforded sovereign immunity from tort actions. *Trumbo v. Metropolitan St. Louis Sewer Dist.*, 877 S.W.2d 198, 201 (Mo. Ct. App. 1994). More specifically, under Mo. Rev. Stat. § 537.600, such sovereign immunity "as existed at common law in this state prior to September 12, 1977" bars a suit unless the injury alleged arises from (1) operation of a motor vehicle by an agent of a governmental entity, (2) a dangerous condition on the entity's property, or (3) under certain circumstances, the public entity has waived sovereign immunity by purchasing liability insurance. Mo. Rev. Stat. § 537.600; *Parish v. Novus Equities Co.*, 231 S.W.3d 236, 245 (Mo. Ct. App. 2007) (citations omitted). Under Missouri law, the plaintiff bears the burden of proving the existence of an insurance policy waiving sovereign immunity. *Hummel v. St. Charles City R-3 Sch. Dist.*, 114 S.W.3d 282, 284 (Mo. Ct. App. 2003).

Defendant Morgan County argues that its MOPERM policy has been held not to waive sovereign immunity under section 537.610. Plaintiff has failed to present any

evidence to show that the policy is not as represented by Morgan County. Therefore, Plaintiff has failed to meet his burden of proving the existence of an insurance policy waiving sovereign immunity. Plaintiff has failed to show that any exception to sovereign immunity is applicable in this case.

### 2. Official Immunity

As to the individual Defendants Witt and Petty, "the doctrine of official immunity protects public officials from civil liability for injuries arising out of their discretionary acts or omissions performed in the exercise of their official duties." *James ex rel. James v. Friend*, 458 F.3d 726, 731 (8th Cir. 2006). However, official immunity does not shield officials from liability arising from their negligent performance of ministerial acts or functions. *Id.*; *Harris v. Munoz*, 43 S.W.3d 384, 387 (Mo. Ct. App. 2001). Defendants persuasively argue that the duties at issue in this case were of a discretionary nature. Plaintiff offers no counterargument. As Plaintiff Folsom has not addressed any of Defendants' arguments with respect to his state law claims, Plaintiff fails to show that any exception to the rule of official immunity applies here.

For the reasons stated above, the Court grants the Morgan County Defendants' Motion for Summary Judgment with respect to Plaintiff's state law claims as well.

## III. Conclusion

Accordingly, it is hereby ORDERED that the Motion for Summary Judgment [Doc.

# 41] filed by Defendants Morgan County, Missouri, Morgan County Sheriff Petty, and Morgan County Detective Ron Witt is GRANTED.

                                                s/ Nanette K. Laughrey
                                                NANETTE K. LAUGHREY
                                                United States District Judge

Dated: June 13, 2011
Jefferson City, Missouri